Let's just wait a minute so the other side can get settled. Apparently all those people were not here for computer exploits. Changing gears a little bit, Your Honor. All right, I think we're good to go, Mr. Hanna. Please proceed. Thank you very much, Your Honor. I believe it's still morning, so good morning, Your Honors. May it please the Court. This is a rare case. This is a rare case in which the appellee in his response brief admitted that the Board's decision cannot stand. Fingen has maintained through these entire proceedings that the correct construction of computer exploit is a portion of program code that are malicious. The Board rejected that construction. The Board adopted the examiner's construction at Appendix 2149, which he explicitly stated that malware is a computer exploit. He doubled downs on that construction in Appendix 2441, in which the examiner states identifying malware is identifying a computer exploit. Now we get to the appeal, and in the response brief at page 15, the appellee has agreed that Fingen's construction is the correct construction. A computer exploit is a portion or portions of program code. I'm looking at page 15. Can you tell us what you're talking to? Because the heading says, Fingen takes an overly narrow view of computer exploits, which suggests that they're not adopting your construction. Your Honor, if you look at page 15, it says the claim states that computer exploits are portions of program code that are malicious. It goes on and gives evidence of that, saying the 305 patent specification states that portions of program code that are malicious are referred to as exploits. He says, given this unambiguous language in Claim 1 and the specification, the director agrees with Fingen that computer exploits are portions of program code that are malicious. So they adopted Fingen's construction. Well then they say, no, the very next page they say, Fingen reads this agreed upon construction to further limit computer exploits to specific malicious lines of code contained in an otherwise benign program. So while they agreed with you at the general level, they didn't agree with the way in which you then further limited or applied that definition. That's what they raised in their appeal brief. But the board's decision is not based on that construction at all. Everything that the board relied upon was a very broad construction saying that malware is a computer exploit. I see your honors is looking at the record. If you look at appendix 2149, it's explicit that the examiner's construction is that a malware is a computer exploit. Well, the fact that they're saying malware is a form of computer exploit doesn't mean that computer exploit can't be a portion of a code that's malicious. I'm confused. If the whole code's malicious, it can't be a computer exploit? So malware can include a computer exploit. But defining something as malware does not mean that it has a computer exploit. And that's the critical difference between the Sandu reference. The Sandu reference... I don't know. I guess maybe I'm confused. I kind of think all malware is malicious and I constantly scan my computers to make sure that there's none loaded into them. So I'm perplexed, I guess. What am I missing? The difference is that the 305 is specific about computer exploits. It's not just malware. So I'll give you an example. No, but that would just be... But malware can be a subset of computer exploits. Malware can be a subset. Exactly. So that's not what the examiner said. He said malware is a form of computer exploit. That means there can be other forms of computer exploits. So, okay. What am I missing? What you're missing is he's saying if you identify something as malware, he's saying that that's a computer exploit. That's incorrect. I think it's even clearer if you look at 2441. I think this will... If you look at 2441... What he says is that if you identify malware, you identify a computer exploit. And that is not the case. Identifying a computer exploit is narrower than identifying malware. And I think this is what happens... This is a good place for an example. If I have malware, malware says to erase all the files on my computer using the format command. That could be malware. That could be malicious software. It's an unwanted computer attack. That's how Sandu describes malware. That doesn't have to have an exploit. That's a legitimate command. Formatting your hard drive is a legitimate command. Sandu would recognize that as malware, but it does not have a computer exploit. And that's what the board base is reasoning on. It had to do this because if you look through Sandu, and I have multiple times, it never looks to see if the code contains an exploit. Ever. It only qualifies to see whether it is malware by matching a signature. It always uses the word, is malware. And so the entire board's decision is based on this erroneous construction that the director has now said was in fact erroneous. So at the very least, this case needs to be remanded in order for a proper analysis under the correct construction. And when they do that, they're not going to be able to find any computer exploits that are identified in Sandu. That's not the way Sandu works. What Sandu does is it takes an executable script, creates these routine tokens, and then compares that to a malware signature score. It is agnostic as to what the executable script is actually doing. It doesn't know whether it contains an exploit or not. In fact, if there was something in the malware script store, in the signature, that said, block this file because it matches this signature, it could block anything, whether it contained an exploit or not, because it doesn't care. It's completely agnostic to it. And that leads into how does the 305 patent work? But just to be clear, the board on page 10 of its opinion, which is at appendix page 11, says, and I think it's, do you really see that the board has adopted an improper construction? And if so, where? Did the board adopt a construction you disagree with? So the board at appendix 11 says, we agree with the examiner that malware is a form of computer exploit when construed in light of the disclosure. They've explicitly adopted the examiner's construction. And that's not the case. Malware is not a form of computer exploit. I just gave one example of that. Malware is not a form of computer exploit. And that's why the 305 patent works the way it does. It contains these parser rules and these analyzer rules that looks within the content. That's what the claim language says. It's there within. I'm going to analyze the code within the content to determine if it contains malicious code. Sandu doesn't do any of that. Sandu abstracts the executable script and then compares it to a signature. And the reason that the board had... So you're arguing that Sandu doesn't disclose malware or that Sandu's malware doesn't have anything that is malicious? I'm arguing that Sandu does not identify computer exploits. No, that's not what I asked. Does Sandu disclose malware? Yes, it says that... Does it identify malware? Isn't that part of what the program's for? In Sandu, I mean, not in your patent. Sure, sure. So Sandu will classify something as malware. So Sandu says this is malware because it matches a signature. It matches a signature of known... It matches a known malware signature. Right, which can or cannot... Doesn't have to contain any exploits at all. It could be... I could put in... How do you know? What evidence is there in the record that a malware signature doesn't contain exploits? That code with a malware signature doesn't contain exploits? That's exactly it. There is no... In Sandu, it never says what's in the malware signature store. And it never has anything that says that a malware signature store contains exploits. It's completely absent. That's the whole point is that the examiner couldn't point to anything. And so that's why they had to take this broad construction to say identifying malware is the same as... Here's the problem, I guess. I think that malware seems to, by the PTO, have been accepted... The definition of malware by the PTO seems to have been something which contains malicious code. Malware. Something which contains malicious code, at a minimum. Okay. Right? That's what I understand from this record. I understand the PTO saying malware, by its very nature, contains malicious code. So if that's sort of the plain meaning of malware, and then Sandu is saying we have something with a malware signature, I understand your argument that, you know, maybe not all apples are bad. I mean, you know, but if something has a known malware signature, doesn't that mean the PTO is understanding as a fact finder, because they're interpreting the reference, that that means it has known malicious code? But it doesn't have to contain a computer exploit. That's what I'm saying. They applied the wrong definition. Now, if you want to look for the definition of malware, let's look to Sandu. Sandu, on Appendix 2962, in Paragraph 2, said, for the purposes of the present discussion, malware, or I'm sorry, malware for the purposes of, let me, okay. Malware for the, it's in the, this is an application, so it's the fifth line down. Malware for the, Which column? The left or the right column? Oh, Paragraph 2. Okay. Malware for purposes of the present discussion is defined as unwanted computer attack.  Like, I don't know. What am I missing? What you're missing is that the unwanted computer attack does not have to contain an exploit. The 305 is very specific. An exploit is malicious code. Is portions of code that are malicious. So you have to identify the portions of the malicious code that are malicious.  Malware. And you're saying malware could have lines of code that on their face standing alone are not malicious, even though other portions of all malware are in fact malicious? No, it doesn't have to contain malicious code at all. That's my format example. But that's not what Sandu says. Sandu says malware is unwanted computer attacks. Okay, so. That's malicious, and I think it's reasonable for the PTO to have concluded that Sandu discloses malware equals unwanted computer attacks equals malicious. Okay, that might be in a malicious attack. So go back to my format example. Formatting your hard drive is a legitimate operation that's performed on a computer. That does not contain malicious code. That does not contain program code that's malicious. That's not what malware is. That's not. Malware is, according to Sandu, an unwanted computer attack. Okay, so if I have. So that's malicious. So malware is malicious. Malware can be malicious, but. That can be, is defined by Sandu to be malicious. I don't know anyone who would say an unwanted computer attack isn't malicious. I agree, Your Honor. But what we're looking at for the 305 patent is the actual. We're diving into the weeds here. We're looking at the actual code. Sandu does not look at the actual code to determine if it contains malicious code. That's why I'm trying to get at it with you. But Sandu does look to say, do you have code, which is, yes, it does, directed to an unwanted computer attack. Because they define it as something that has a malware signature. And malware is defined as unwanted computer attacks. No, it never. Sandu never looks to see if it has the code. Ever. It's totally agnostic. I understand that you're saying it doesn't look to see or identify which lines of code amount to the unwanted computer attack. But it's nonetheless saying we're identifying software that has an unwanted computer attack embedded within their software. It never says that. It only says is malware. If you look through Sandu, you never see something that says it contains. That's what they keep saying. It is malware. And malware is defined as an unwanted computer attack. And that attack can only occur through code. It's not like they're throwing eggs. I mean, I don't understand. Your Honor, that's the difference between the computer exploit that's being used here. And I would like to get to the way that it functions is that you have to have these parser and analyzer rules that correspond to these computer exploits. What the director does is they point to the malware signature store for the parser rules. Sandu is explicit on paragraph 40 that the parser rules create the routine tokens. It has nothing to do with the malware signature store. The claims of the 305 patent are specific in that it has parser and analyzer rules that correspond to computer exploits. If you look at paragraph 40 of Sandu, it explicitly states that you parse the content to create the routine tokens. You never parse anything to put anything in the malware signature store. Does that make sense? So what the director has had to do is point to the malware signature store as the parser rules, the analyzer rules, the computer exploits. This turns Sandu on its head because Sandu says that you parse to create these routine tokens. And then the routine tokens are compared to the malware signature store. So when they're talking about parsing, these parsing rules, they're talking about something that's in the malware signature store. That can't be what Sandu's about. Because Sandu says explicitly on paragraph 40 that you do parsing to create the routine tokens. There's nothing in Sandu that says that these signatures are also parser rules or also analyzer rules. And that's the point that the dissent made. At pages 16 and 17 of the dissent is that the board is pointing to the malware signature store as everything. The parser rules, the analyzer rules. There's no rules at all in Sandu. Sandu doesn't talk about rules at all. It doesn't talk about, especially doesn't talk about rules that correspond to computer exploits. And that's where it comes down is that this definition is just an improper definition. We don't have a record to support that Sandu meets the correct definition. You've far exceeded your time and your rebuttal time. We'll return some rebuttal time. May it please the court. I'm genuinely confused as to this argument about computer exploits that we somehow in our brief disavowed what the board or examiner did. If you look at what the examiner did on appendix page 2149, he states that the term computer exploit is defined in the patent as portions of program code that are malicious. And then says that malware is a form of computer exploit. It's exactly what we said in our brief. And again, on appendix page 2441, he repeats that a computer exploit is defined as portions of program code that are malicious. So everything that we did and said in our brief was fully consistent with what the examiner did. Can I ask you instead to turn, unless anyone else has questions they want to ask about that. Can I ask you to turn instead to whether Sandu discloses the parser rules? Sure. So the examiner and the board found that the routine token sets in the malware signature store of Sandu are the parser rules. And parser rules are defined as patterns of tokens that form syntactical constructs of program code. I don't think there's any dispute that. Yeah, but didn't you admit in your brief that figure eight doesn't show parser rules in malware script signatures? Well, so figure eight are the routine token sets of the incoming code. There's no figure in Sandu showing the code in the malware signature store. Our point was, and I think this was agreed with in the reply brief, was that the board made the reasonable inference that the routine token sets in the malware signature store would look similar to the code that's in figure eight. Because that's the code that it's being compared to. It's just that there's no figure showing that code. But the malware signature store is going to include code that looks similar to what's in figure eight. And this idea that the board is relying on the routine token sets in the malware signature store for everything, the parser rules, the analyzer rules, and the computer exploits, that comes from the claim language itself. It says a database of parser and analyzer rules corresponding to computer exploits. So it seems like all of those things are the same thing. And that's why the board is relying on the code in the malware signature store to meet those limitations. Are there no further questions? Thank you. I think one admission that we just got on the rebuttal there was that there is no disclosure in Sandhu of what's in the malware signature store. And that's true. Because the malware signature store does not identify computer exploits. With regard to the parser rules, the claim is explicit that it says a database of parser and analyzer rules corresponding to computer exploits. When you look at Sandhu at paragraph 40, what Sandhu says is that it parses the incoming executable script to generate routine tokens. That's where Sandhu does parsing. It has nothing to do with a malware signature store that's already on the system. But that's what the director and the board and the examiner pointed to. They pointed to this malware signature store that's already on the system that has nothing to do with what Sandhu describes as parsing. That parsing to generate the routine tokens will generate routine tokens without regard to any computer exploits at all. That's undisputed. They couldn't point to that parsing. That's why they changed course. If you looked in our briefing and at the proceedings below, they changed course. Saying, oh, we're going to point to the parsing in paragraph 40 for the parser rules. Continued to say that. We get one paragraph in the examiner's answer that says, okay, the parser rules can be in the malware signature store. And then the board harps on that. That's because our entire argument was that the parser rules had to correspond to computer exploits. So they point to the malware signature store. But now that they point to the malware signature store, there's no parsing. Because the only parsing that happens in Sandhu is to generate the routine tokens. And that is undeniably has nothing to do with any computer exploit. It's a straight parsing function to generate the routine tokens. Thank you. All right. Thank you. And the case is submitted. That concludes our proceeding for this morning.